**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**


| | |
|---|---|
| ROBIN L. PINILLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:17 CV 1445 DDN |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |


## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Robin L. Pinilla for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.


## I. BACKGROUND

Plaintiff Robin L. Pinilla, born September 3, 1963, applied for Title II benefits on November 18, 2013. (Tr. 14, 76). She alleged a disability onset date of January 1, 2010, due to bipolar disorder, depression, and anxiety. (Tr. 76). Plaintiff's application was initially denied on February 4, 2014. (Tr. 76-87).

On February 27, 2014, plaintiff requested a hearing before an ALJ. (Tr. 96-97). On October 1, 2015, the ALJ heard testimony from plaintiff and Vocational Expert (VE) Teresa McLean. (Tr. 32-75). On March 23, 2016, the ALJ found that plaintiff was not disabled. (Tr. 11-31). On March 24, 2017, the Appeals Council denied plaintiff's

request for review. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

The following is a summary of plaintiff's medical history relevant to this appeal. On November 25, 2009, plaintiff was admitted to Mercy Hospital St. Louis' intensive care unit for intentional overdose of nortriptyline. Plaintiff presented with slurred speech, depression, and suicidal ideation. Plaintiff reported she had swallowed the remainder of an old prescription of nortriptyline and written a suicide note before going to bed. Plaintiff reported one prior suicide attempt by means of Ativan overdose roughly four to five years prior. Plaintiff reported emotional instability associated with her recent decision to stop taking medication for bipolar disorder, including lithium and Lamictal. Plaintiff mentioned drinking about six cans of beer each night but denied previous problematic alcohol or drug use. Treating physician Frederick G. Hicks, M.D., prescribed Trileptal and recommended plaintiff resume taking lithium and Seroquel. (Tr. 260-66).

On November 27, 2009, plaintiff was transferred to Mercy's psychiatric division. Discharging physician Steven A. Harvey, M.D., noted that plaintiff had successfully completed individual and group therapy while denying suicidal ideation throughout. Dr. Harvey reported that plaintiff took appropriate steps to make her home safe, including removing alcohol and old medications. Dr. Harvey reported that plaintiff was cooperative and stable on the day of discharge with no suicidal ideations or evidence of psychosis. Dr. Harvey changed plaintiff's prescription for lithium to Lithobid to alleviate gastrointestinal side effects. Dr. Harvey recommended that plaintiff follow up with her treating psychiatrist, Dr. Bhat, as soon as possible. (Tr. 288-90).

On December 1, 2009, plaintiff saw Savita S. Bhat, M.D., to treat issues related to plaintiff's suicide attempt. Dr. Bhat continued prescriptions for lithium and Seroquel and added a prescription for Depakote. On February 16, 2010, Dr. Bhat increased the Seroquel dosage but lowered it after two months. On April 20, 2011, Dr. Bhat again

raised the Seroquel dosage after plaintiff reported spending a week in bed. On July 26, 2012, Dr. Bhat prescribed clonazepam to help relieve restless leg syndrome at bedtime. (Tr. 447-59).

On August 1, 2012, plaintiff met with Don R. Snodgrass, M.D., for a physical exam. Dr. Snodgrass reported that plaintiff had been managing her bipolar disorder by taking lithium and Seroquel and that plaintiff had not had a psychotic episode for several years. Plaintiff reported a recent mixed episode, during which she experienced extreme distress without any precipitating event. Yet, Dr. Snodgrass noted that plaintiff was "doing very well on lithium and Seroquel." (Tr. 553-56).

On October 1, 2013, Dr. Bhat diagnosed plaintiff with moderate bipolar 1 disorder after plaintiff underwent a general psychiatric examination. Dr. Bhat reported that plaintiff demonstrated a depressed mood and affect but also a calm and cooperative attitude, an intact memory, a logical thought process, and fair judgment. Dr. Bhat prescribed Lamictal and continued the lithium. Dr. Bhat also recommended cognitive behavioral therapy (CBT) to address anxiety and avoidance and encouraged increased physical activity. (Tr. 446).

On December 16, 2013, plaintiff reported an ability to accomplish a number of daily activities, including: cleaning and doing laundry, playing memory games, taking her medication, preparing meals, and taking care of her dog. Plaintiff also reported a limited ability to shop for groceries, handle money, and go out in public alone. (Tr. 202-12).

On January 18, 2014, plaintiff met with Christi Moore, Ph.D., for a consultative psychological evaluation. Plaintiff reported feeling a varying sense of hopelessness, lack of interest or pleasure in activities, challenges with sleep, and feelings of guilt. Plaintiff also reported being more likely to seek immediate assistance from her psychiatrist for medication adjustments. Plaintiff reported she does not require assistance with personal activities of daily living; however, plaintiff stated she relied on memory aids and that she needed a caregiver to help with activities outside the home. Plaintiff reported spending time with family and close friends but said she does not engage in other social activities. (Tr. 471-75).

Dr. Moore reported that plaintiff displayed the ability to maintain adequate attention during the exam, appeared to comprehend questions, and seemed to have good practical judgment and a good understanding of more complex aspects of situations. Dr. Moore also opined that plaintiff might struggle with functioning in social settings or placements with interpersonal demands due to plaintiff's anxiety and reported memory challenges. Dr. Moore reported that plaintiff did not appear capable of managing her own funds, but concluded that with continued psychiatric and occupational supports, plaintiff could be expected to function with improvement. Dr. Moore diagnosed plaintiff with bipolar 1 disorder, panic disorder without agoraphobia, and alcohol abuse. Dr. Moore assigned a Global Assessment of Functioning (GAF) score of 46. (Tr. 475).

On March 13, 2014, plaintiff met with Leanne Watson-Ficken, D.O., for a physical exam. Plaintiff stated her bipolar disorder had been under control, but she also reported symptoms of depression, anxiety, and sleep disturbances. Plaintiff reported no confusion or memory loss issues. Plaintiff reported consuming 4-5 drinks of alcohol once or twice per week. (Tr. 505-07).

On May 13, 2014, plaintiff reported an increased ability to finish errands at home but also continued difficulty with driving and being in public. Plaintiff reported she had quit consuming alcohol. Plaintiff successfully completed memory tasks. Dr. Bhat encouraged plaintiff to continue setting self-care goals. (Tr. 479).

On May 23, 2014, Dr. Watson-Ficken submitted a Physical Residual Functional Capacity ("RFC") Assessment. Dr. Watson-Ficken noted that plaintiff was experiencing chronic depression, anxiety, and poor sleep due to bipolar disorder. Dr. Watson-Ficken reported a marked limitation in plaintiff's ability to deal with work stress, and that plaintiff's poor coping skills would make it difficult for her to work full-time on a sustained basis. Dr. Watson-Ficken expected plaintiff would be off-task more than 20 percent of an eight-hour work day and would require redirection one to two times per week. Dr. Watson-Ficken also anticipated plaintiff's impairments would cause about two absences per month. (Tr. 517-18).

On May 23, 2014, plaintiff reported to Dr. Watson-Ficken that she was experiencing depression, anxiety, and sleep disturbances. Plaintiff reported no confusion or memory loss issues. (Tr. 502-04).

On May 27, 2014, Dr. Bhat submitted a mental RFC assessment. Dr. Bhat identified the following symptoms: poor memory, sleep disturbance, mood disturbance, and recurrent panic attacks; however, Dr. Bhat reported that plaintiff was responding to medication. Dr. Bhat opined that plaintiff would have difficulty working a full-time job on a sustained basis. She expected plaintiff to be off-task during at least 20 percent of an eight-hour work day and to require redirection one to two times per day. Dr. Bhat was unable to assess how often plaintiff would be absent from work. (Tr. 520-21).

Dr. Bhat noted the following functional limitations due to plaintiff's impairments: moderate restriction of daily living activities; moderate difficulty in maintaining social functioning; moderate limitation in areas of understanding and memory; frequent difficulty maintaining concentration and persistence; seldom repeated episodes of decompensation of extended duration; and moderate limitation in the ability to complete a normal work day without interruption. (Tr. 521-23).

On August 4, 2014, plaintiff reported a relatively stable mood but also that she had trouble staying asleep. Plaintiff related an inability to leave her home without someone accompanying her. Plaintiff reported no panic, worrying, or feelings of hopelessness. Dr. Bhat encouraged plaintiff to schedule a sleep study. (Tr. 481-82).

On four separate occasions from August 22, 2014, through July 27, 2015, Dr. Watson-Ficken conducted depression screenings indicating no need for intervention, finding that plaintiff expressed interest and pleasure in certain activities and had no feelings of depression or hopelessness. During each visit, Dr. Watson also noted that plaintiff appeared alert, oriented, and in no acute distress. (Tr. 491-501).

On both August 22, 2014, and October 31, 2014, plaintiff reported consuming 4-5 drinks of alcohol once or twice per week. (Tr. 498-501).

On November 4, 2014, plaintiff reported that she stopped taking Depakote because of weight gain and over-sedation, but plaintiff also stated that she was doing well

emotionally. Plaintiff reported improved sleep, which she attributed to Relpax for alleviating restless leg syndrome. Dr. Bhat made a note to check plaintiff's lithium dosage to confirm therapeutic levels. (Tr. 483-84).

On February 17, 2015, plaintiff reported a continued pattern of avoidance secondary to panic and anxiety, as well as an increased difficulty with social situations or events involving crowds. Plaintiff stated she was working with family to improve her comfort with leaving her home. Plaintiff further stated a desire to find a clerical job to get her out of the house; however, she also reported mood swings and inconsistency in feelings of hope and empowerment to make changes. Plaintiff reported disrupted sleep with 3-4 hours of uninterrupted sleep each night. Plaintiff stated she had completely abstained from alcohol for the previous 41 days. (Tr. 485).

Dr. Bhat recommended plaintiff use an anxiety workbook after discussing strategies to overcome avoidance patterns. Dr. Bhat noted the need to avoid certain medication due to plaintiff's history of alcohol abuse. Dr. Bhat prescribed Trileptal to address sleep and mood issues and strongly recommended behavioral therapy. (Tr. 486).

On May 4, 2015, Plaintiff reported consuming 4-5 drinks of alcohol once or twice per week. Plaintiff reported she was experiencing depression and anxiety, but reported no memory loss, confusion, or sleep disturbances. (Tr. 494-96).

On June 11, 2015, plaintiff reported having auditory hallucinations and hearing many voices at once. Plaintiff also reported visual hallucinations. Dr. Bhat increased plaintiff's dosage of Seroquel. (Tr. 487).

On July 23, 2015, plaintiff noted continued avoidance issues, while having success with day-to-day functioning. Plaintiff reported the hallucinations had become increasingly rare and indistinct. Dr. Bhat increased plaintiff's dosage of Seroquel. Dr. Bhat and plaintiff discussed improving diet and exercise to address hypercholesterolemia. (Tr. 488-89).

On October 9, 2015, Dr. Bhat submitted a second mental RFC assessment. Dr. Bhat identified the following symptoms: poor memory, mood disturbance, delusions or hallucinations, recurrent panic attacks, and difficulty thinking or concentrating. Dr. Bhat

reported that mood stabilizers had improved plaintiff's bipolar symptoms but that plaintiff had continued anxiety issues. Dr. Bhat found that plaintiff would have difficulty working a full-time job on a sustained basis. She noted that she expected plaintiff to be off-task at least 20 percent of an eight-hour work day and would need redirection one to two times per day. Dr. Bhat also reported that she expected plaintiff to miss work more than three times per month due to plaintiff's impairments. Dr. Bhat indicated plaintiff could manage benefits in her own interest; however, Dr. Bhat also reported that plaintiff had been unable to function outside of a highly supportive living arrangement for at least a year and indicated a continued need for such an arrangement. Furthermore, Dr. Bhat reported no restriction on either understanding and remembering very short and simple instructions or maintaining socially appropriate behavior. (Tr. 526-30).

Dr. Bhat noted the following functional limitations due to plaintiff's impairments: slight restriction of daily living activities; marked difficulty in maintaining social functioning, specifically the ability to interact appropriately with the public; moderate limitation in areas of understanding and memory; frequent difficulty maintaining concentration and persistence, with marked limitation in the ability to complete a normal work day without interruption from psychologically based symptoms; and often repeated episodes of decompensation of extended duration. Dr. Bhat specifically noted that work activities would be limited by plaintiff's social anxiety and agoraphobia. Dr. Bhat also indicated a marked limitation in plaintiff's ability to travel to unfamiliar places and use public transportation. Dr. Bhat reported that alcohol abuse was not a contributing factor in the assessment, and limitations would persist if plaintiff ceased alcohol consumption. (Tr. 527-30).

### III. TESTIMONY FROM ALJ HEARING

#### A. Plaintiff's Testimony

Plaintiff lives at home with her husband as well as one of her four children when he is not in school. Plaintiff has a driver's license with no limitations; however, she rarely drives. Plaintiff received a high school diploma and graduated from the LPN

program at St. Charles Community College. She also received a secretarial certificate from Hickey Business School after graduating from high school. (Tr. 42-43).

Beginning in 2000, plaintiff worked as a receptionist for Gordon & Gundaker Real Estate. She primarily answered phone calls and maintained a calendar for real estate agents. She also greeted customers and entered pre-written data into an information system for new listings. The job required no lifting. (Tr. 44-45).

In 2001, plaintiff began working for St. Louis University where she greeted patients, collected copays, and scheduled appointments. She worked in this capacity for about a year. (Tr. 45). In 2003 and 2004, plaintiff worked roughly one year for Red Cross, where she recorded patient histories and performed blood draws. In this capacity, plaintiff worked on her feet the entire day and regularly lifted boxes weighing 20-25 pounds. For less than a year in 2005, plaintiff worked for PBS of Central Florida, a methadone treatment center, where she assessed patients and dosed methadone. The job required her to be on her feet often and occasionally lift 10-pound boxes. (Tr. 45-47).

Starting in 2006, plaintiff worked for Medical Transportation Management as an LPN, performing phone assessments for the first four months. She was later promoted to manager, a position she held for roughly six months. Plaintiff supervised about 20 employees in this role, and she resolved complaint calls, made patient assessment decisions, conducted meetings, and evaluated employees. The LPN position required little standing, but the managerial position required more movement. Neither position required any lifting. Plaintiff left her job as manager because of stress resulting from an uncertain budget and layoffs. She preferred working directly with patients. (Tr. 47-48).

Starting in 2007 and lasting about a year, plaintiff worked for the State of Missouri as an LPN at the Metropolitan St. Louis Psychiatric Center. There, she drew blood 15-20 times per day, assisted doctors on their rounds, and coordinated appointments and discharge procedures, which consisted of making phone calls and setting up outpatient programs. The job required plaintiff to be on her feet often and lift objects up to 20 pounds. (Tr. 48-49).

Plaintiff noted that in her capacity working in hospitals, she would take on duties similar to those of a CNA, including administering catheters, taking blood pressure, and bathing patients. (Tr. 51).

Following her employment at the Psychiatric Center, plaintiff tried several other LPN jobs but could not keep any of them for long due to panic attacks. Plaintiff's attributed her anxiety to feeling overwhelmed by a large number of patients coupled with relatively few staff members. (Tr. 50).

Plaintiff cited anxiety attacks as the primary reason for her inability to perform past work and said the anxiety often stems from fear of inadequate job performance. Plaintiff also cited a fear of driving, which she attributed to concerns that she would hit something. Further, plaintiff fears being around unfamiliar people because she starts to "freak out" when they get too close. Plaintiff usually requires a friend to accompany her on trips outside her home, such as to the grocery store, but she sometimes ventures out on her own. Plaintiff is able to manage her household on her own and spends her time reading, watching TV, cleaning, and surfing the Internet. (Tr. 51-54, 56).

Plaintiff noted that her prescribed medication helps with her depression and bipolar disorder. However, her anxiety persists because she cannot take certain medication due to her history of alcohol abuse. Plaintiff said she drank to help her sleep and that the drinking did not affect her mood or medication. She said she quit drinking heavily in January 2015 and since consumes two or three beers a month. By consuming less alcohol, plaintiff said she feels healthier but has issues sleeping. Plaintiff noted that Dr. Bhat began spacing out her dosage of Seroquel to improve sleep patterns, but plaintiff still wakes up at least five times a night and experiences racing thoughts. Plaintiff cited auditory hallucinations that "come and go." Dr. Bhat has treated the hallucinations with increased Seroquel, but they return every six to eight months. (Tr. 55-58, 61).

About two to three times a month, plaintiff stays in bed for most of the day, with more frequency during winter months, when she stays in bed as many as six days a month. Plaintiff cited problems with concentrating on tasks involving reading or writing for more than five minutes. Completing simple paperwork may take days when it usually

would have taken minutes.  Plaintiff uses labels and directions written down in her kitchen to help her focus and remember how to complete tasks.  (Tr. 58-60).

## B. Vocational Expert Testimony

The VE testified that certain skills acquired in plaintiff's past work as a receptionist – such as active listening, reading comprehension, speaking, and time management – would transfer to other jobs at the sedentary level, such as optometric assistant or cardiac monitor technician, but those skilled jobs may require additional training.  The VE testified that other skills acquired in past work would transfer to sedentary positions.  (Tr. 65-69).

The ALJ asked whether someone with plaintiff's age, education, and work experience could hypothetically perform her past work as someone who is without exertional limitations but is limited to simple, routine, repetitive tasks with only occasional interaction with the public and coworkers.  The VE responded that past work could not be done as it would involve more than occasional contact with the public and coworkers.  Thus, the VE testified, plaintiff would be limited to unskilled work, such as an industrial cleaner, laundry worker, or a marker.  (Tr. 70-71).

The ALJ then asked what occupations could be performed with no interaction with the public.  The VE answered that the industrial cleaner job probably could be performed; roughly half the laundry work could be performed; and all of the marker work could be performed.  The VE also cited two sedentary jobs – document preparer and final assembler – that could be performed in full without public interaction.  The VE stated, however, that such a hypothetical employee would be eliminated from all competitive employment prospects if the employee missed two or three days of work each month or was off-task more than 10 percent of a regular workday.  (Tr. 72-74).

## IV. DECISION OF THE ALJ

On March 23, 2016, the ALJ issued a decision that plaintiff was not disabled under Title II of the Social Security Act through September 30, 2014, the last date insured.  (Tr.

14-27). At Step One of the prescribed regulatory decision-making scheme, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 1, 2010. At Step Two, the ALJ found that plaintiff suffers from the following severe impairments supported by medically accepted evidence: affective (mood) disorder, anxiety disorder, and alcohol abuse. (Tr. 16).

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18).

The ALJ considered the record and found that plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b), except that she could occasionally lift, carry, push, and pull 20 pounds and frequently lift and carry 10 pounds; sit, stand, or walk, off and on, for up to six hours in a regular eight-hour workday; understand, remember, and carry out simple, routine, and repetitive tasks; make simple work-related decisions; and occasionally respond appropriately to supervisors and co-workers but not the general public. (Tr. 20). At Step Four, the ALJ found that plaintiff was unable to perform any past relevant work through the date last insured. (Tr. 25).

At Step Five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that plaintiff could have performed through the date last insured. Accordingly, the ALJ found that plaintiff was not disabled at any time from the alleged onset date through the date last insured. (Tr. 25-26).

## V. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the Court considers

evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. *Pate-Fires*, 564 F.3d at 942. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five. *Id.* At this final step, the Commissioner considers the claimant's RFC in conjunction with her age, education, and work experience to determine if the claimant retains the requisite RFC to adjust to other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

# VI. DISCUSSION

Plaintiff argues that the ALJ (1) erred in weighing the opinion of treating psychiatrist Dr. Bhat at Step Four and (2) erred in relying on the VE's opinion at Step Five. The Court disagrees.

## A. Substantial Evidence Existed to Weigh Dr. Bhat's Opinion as Partly Controlling

Plaintiff argues the ALJ improperly weighed the opinion of treating psychiatrist Dr. Bhat by failing to state which portions of the opinion are controlling and failing to consider non-controlling opinion factors. Ultimately, plaintiff argues that Dr. Bhat's opinion should have been given controlling or significant weight. (Doc. 16 at 3). The Court finds that, contrary to plaintiff's arguments, the ALJ had substantial evidence to limit the weight of Dr. Bhat's opinions where they lacked consistency, and the ALJ provided sufficient reasoning for the weight afforded to the opinions.

The ALJ must consider all relevant evidence in assessing RFC, and the RFC must be supported by "some medical evidence" of the claimant's workplace abilities; however, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). It is the ALJ's responsibility to weigh conflicting evidence and to resolve disagreements among physicians. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). A treating physician's opinion controls if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence. *Prosch v. Astrue*, 201 F.3d 1010, 1012-13 (8th Cir. 2012). While treating physician opinions typically receive more weight than opinions from one-time examiners, a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. *See* 20 C.F.R. § 404.1527(c)(1)-(2); *See Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). On judicial review, the Court asks whether substantial evidence existed to support the ALJ's decision, not whether substantial evidence existed to reverse the decision. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).

Plaintiff correctly asserts that a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ must give "good reasons" for the weight allotted but is not required to discuss every factor considered. *See* 20 C.F.R. § 404.1527(c)(2). Here, substantial evidence supported the ALJ's decision to give controlling weight to Dr. Bhat's opinions only where consistent with the record, because the opinions were inconsistent with Dr. Bhat's own treatment notes from routine examinations and because plaintiff's treatment regimen – exclusively medication – was relatively modest. *See Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) (holding that a treating physician's opinion that a claimant had certain limitations did not warrant controlling weight due to inconsistencies with the medical evidence, including the physician's own treatment notes in addition to a conservative treatment regimen.); *see also Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir.2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

In her first RFC assessment, Dr. Bhat opined that plaintiff would have mild to moderate restriction across a variety of workplace tasks and would have difficulty working a full-time job on a sustained basis. (Tr. 520-23). In her second assessment, Dr. Bhat found that plaintiff would have marked difficulty in her ability to maintain social functioning and concentration and expected plaintiff to miss more than three days of work per month. (Tr. 526-30). However, as the ALJ noted, these two assessments are not reflective of findings on longitudinal examinations during the period from the alleged onset date to the date last insured, which is replete with plaintiff's routine reports that she was doing relatively well.[1] (Tr. 21-22, 446, 449, 453-55, 477, 479, 481, 483, 485, 488).

---

[1] It was proper for the ALJ to cite Dr. Bhat's treatment notes even when they occurred after plaintiff's last date insured of Sept. 30, 2014, because they provide valuable information about plaintiff's mental impairments as they existed during the period of alleged disability. "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'"

For instance, from April 13, 2010, to May 13, 2014, Dr. Bhat routinely noted that plaintiff showed signs of doing well and managing symptoms. In addition, on August 4, 2014, about two months after Dr. Bhat's first assessment, she noted plaintiff displayed a relatively stable mood accompanied by no panic, worrying, or feelings of hopelessness. (Tr. 481-82). Further, on July 23, 2015, in the months leading up to Dr. Bhat's second assessment she noted that plaintiff was "doing well" with her mood and day-to-day functioning; experiencing no memory loss or confusion; experiencing fewer, less distinct hallucinations; experiencing no feelings of sadness, hopelessness, panic or worrying; experiencing stable energy and motivation; and having no issues with racing thoughts, impulsivity, or recklessness. (Tr. 488-89).

As the ALJ noted, the marked level of limitation stated by Dr. Bhat is somewhat inconsistent with Dr. Bhat's findings made during routine examinations. (Tr. 24). Contrary to plaintiff's assertions, failure to state the weight given to an opinion, alone, is not error. *Cf. Grabel v. Colvin*, 770 F.3d 1196, 1201-02 (8th Cir. 2014). An ALJ is not required to state the amount of weight given, but need only clarify the reasons the opinion was discounted. *Id.* Thus, the ALJ did not need to explicitly reference every part of Dr. Bhat's opinions that was not given substantial weight. Rather, the ALJ need only advance the reasons for discounting the opinions, as done here by indicating where Dr. Bhat's opinions were inconsistent with her treatment notes.

As further support, the ALJ is entitled to weigh Dr. Bhat's opinions through the lens of their consistency with the record as a whole and disregard them where they lack support in the record. *See* 20 C.F.R. § 404.1527(c)(4); *see also Casey*, 503 F.3d at 692. The ALJ found the limitations advanced by Dr. Bhat were tempered by the opinions of an examining psychologist and a reviewing psychologist. (Tr. 24, 80-85, 471-75, 491-501). For example, where Dr. Bhat opined with no explanation that plaintiff would have difficulty working a full-time job on a sustained basis, consultative examiner Dr. Moore

---

*Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (quoting *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir.1998)).

concluded that, with continued support, plaintiff could be expected to function with improvement.  (Tr. 475, 520).  Moreover, the ALJ found that a number of plaintiff's actions run counter to the level of limitation suggested by Dr. Bhat, including plaintiff's refusal to take prescribed medications (Tr. 23-24, 485-87), plaintiff's failure to participate in recommended therapy (Tr.24, 446, 486), and plaintiff's refusal to make lifestyle changes so additional treatments could be prescribed.  (Tr. 24, 494-96, 498-99).  A claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and can be used to discount the opinion.  *Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (citation omitted).  Thus, substantial evidence supported the ALJ's decision to afford Dr. Bhat's opinions only limited controlling weight based on their inconsistency with the record as a whole.

When a treating physician's opinion is not controlling, the ALJ considers several factors when assessing its weight.  20 C.F.R. § 404.1527(c); *Owen*, 551 F.3d at 800.  These include the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ.  *See* 20 C.F.R. § 404.1527(c)(1)-(6).  Plaintiff correctly argues that the aforementioned non-controlling factors should be considered by the ALJ when assigning weight to non-controlling opinions by treating physicians.  (Doc. 16 at 9-10).  However, plaintiff's contention that the ALJ "must articulate the consideration of these factors in the written decision" (*Id.*) is beyond what the regulations and precedent require.

The regulations require that the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  20 C.F.R. § 404.1527(f)(2).  However, the regulations set forth no "burden of definite articulation" as plaintiff argues; rather, the ALJ must only give "good reasons"

for the weight assigned. (Doc. 16 at 9-10); *See* 20 C.F.R. § 404.1527(c)(2); *See also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005), *Singh*, 222 F.3d at 452.

As mentioned above, the ALJ discounted Dr. Bhat's opinion where it was inconsistent with the record as a whole and where inconsistent with Dr. Bhat's treatment notes. (Tr. 21-22, 24). The ALJ's analysis took into consideration that plaintiff's subjective complaints often included reports that she was managing her symptoms and that Dr. Bhat's treatment records as a whole routinely reflected normal clinical findings aside from two isolated examinations. (Tr. 21-22). Furthermore, substantial evidence in the record showed that plaintiff cared for her personal hygiene, maintained a household, and prepared meals for herself and her husband (Tr. 53, 202-05, 474, 479, 488-89); plaintiff exhibited socially acceptable behavior and an ability to relate to others (Tr. 19, 474-75); and plaintiff failed to quit abusing alcohol and take her medication as prescribed (Tr. 19, 55-56, 472, 486).

While the ALJ must explain the weight given to a treating physician's opinion, the ALJ is not required to discuss all factors outlined in 20 C.F.R. § 404.1527(c)(2) in deciding what weight to assign. The Eighth Circuit held in *Papesh v. Colvin*, among other things, that the treating physicians' opinions were entitled to substantial weight. 786 F.3d 1126, 1133 (8th Cir. 2015). There, the Court of Appeals decided that the ALJ could not properly give the opinions non-substantial weight since the ALJ did not find the opinion inconsistent with the record as a whole. *Id*. In the instant case, however, the ALJ did find the ALJ opinion inconsistent with the record. Furthermore, the ALJ considered many, if not all, of the non-controlling factors listed above and gave good reasons for conclusions when discussing Dr. Bhat's treatment throughout the opinion. The mere fact that the ALJ failed to articulate *every* reason and *every* factor does not require remand. Thus, substantial evidence existed for the ALJ to limit the controlling weight of and partially discount Dr. Bhat's opinion.

**B. The ALJ Properly Relied on the VE Testimony**

Next, plaintiff argues the ALJ erred at Step Five by improperly relying on the VE's opinion that plaintiff could adjust to work existing in significant numbers in the national economy. (Doc. 16 at 12). In particular, plaintiff argues the ALJ did not include in his hypothetical question to the VE the complete set of limitations as determined in the RFC. (Doc. 16 at 12-14). Furthermore, plaintiff argues the ALJ erred by failing to resolve a conflict between the VE testimony and the Dictionary of Occupational Titles (DOT). (Doc. 16 at 14-15). The Court finds that the ALJ properly framed the hypothetical question and properly relied on the VE's opinions.

In order to constitute substantial evidence, a VE's testimony must be based on a hypothetical question that captures the *concrete consequences* of the claimant's deficiencies. *Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)) (emphasis added). The ALJ is not required to frame the hypothetical in the specific diagnostic terms used in medical reports to describe the claimant's impairments. *Lacroix*, 465 F.3d at 889. The hypothetical must include those impairments the ALJ finds are substantially supported by the record as a whole. *Id*. (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir.1994)).

Here, the ALJ's hypothetical question to the VE encompassed all the concrete consequences of plaintiff's relevant impairments reflected in the ALJ's finding of RFC. The ALJ found that plaintiff's RFC restricted her to light, unskilled work, defined in 20 C.F.R. § 404.1567(b). (Tr. 20). The ALJ further defined plaintiff's RFC by specifying certain mental and physical abilities based on the record: that plaintiff could (1) occasionally lift, carry, push, and pull 20 pounds and frequently lift and carry 10 pounds; (2) sit, stand, or walk, off and on, for up to six hours in a regular eight-hour workday; (3) understand, remember, and carry out simple, routine, and repetitive tasks and make simple work-related decisions; and (4) occasionally respond appropriately to supervisors and co-workers but not the general public. *Id*.

Plaintiff argues the ALJ erred by wording the hypothetical question in a manner inconsistent with the RFC determination. (Doc. 16 at 12-13). The ALJ did not use the

exact wording from the RFC when questioning the VE.  *Id.*  But any such departure was harmless because the ALJ's question to the VE adequately captured the concrete consequences of plaintiff's impairments.

First, the ALJ sufficiently communicated plaintiff's physical limitations to the VE by inquiring about the exertion levels for the jobs proposed by the VE and subsequently narrowing the scope of the VE's answers to those requiring either light or sedentary work.  (Tr. 70-71).  Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  SSR 83-10.  The physical limitations described in the RFC mirror this definition of "light work."  Furthermore, when an individual can perform light work, she is capable of performing sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  *See* 20 C.F.R. § 404.1567(b).  Accordingly, any failure to explicitly state plaintiff's physical limitations in the hypothetical question is harmless and would not change the ALJ's finding that someone with plaintiff's exertional limitations could perform the two sedentary jobs – document preparer and final assembler – stated by the VE.  Thus, the VE's answers addressed the concrete consequences of plaintiff's physical limitations.

Second, plaintiff argues that the ALJ failed to communicate plaintiff's mental limitations in the hypothetical question, specifically regarding her reduced ability to interact with co-workers and the public.  (Doc. 16 at 12-13).  In the RFC assessment, the ALJ limited plaintiff to "occasionally responding appropriately to supervisors and co-workers but not the general public."  (Tr. 20).  In the first hypothetical question posed to the VE, the ALJ failed to accurately state plaintiff's limitation with regards to public interaction.  (Tr. 70).  However, in the second hypothetical question, the ALJ narrowed the VE's testimony to work that required no interaction with the public.  (Tr. 72).  Still, the VE answered that plaintiff could perform the jobs of marker, document preparer, and

final assembler with no public interaction and in accordance with all other limitations outlined in the RFC.  (Tr. 71-72).

Plaintiff correctly argued that the ALJ did not use the words "respond appropriately" in the hypothetical; however, plaintiff did not point to evidence that would have been presented that could have changed the result if the ALJ used such language. (Doc. 16 at 12).  It is plaintiff's burden in the first instance to provide medical evidence of the existence and severity of her mental impairments.  *See Kamann v. Colvin*, 721 F. 3d. 945, 950 (8th Cir. 2013).  Thus, the ALJ's revised question captured the concrete consequences of plaintiff's mental limitations with regards to social interaction, and the change in wording was harmless error.  In upholding the ALJ's action, the Court has relied solely on the grounds articulated by the ALJ.  As a result, any argument based on the "*Chenery* doctrine"[2] that the Court might have relied on unexpressed grounds is moot. (Doc. 22 at 2-3).

Finally, plaintiff argues that the ALJ erred in adopting the VE's opinions by failing to weigh them for supportability and consistency.  (Doc. 16 at 14).  Specifically, it appears plaintiff is arguing that the VE's opinions conflict with information in the Dictionary of Occupational Titles and that the ALJ failed to resolve the conflict.  *Id.*  If such a conflict existed, the ALJ resolved it under the guidelines in SSR 00-4p, and thus, the argument is without merit.

When a conflict exists between VE testimony and DOT information, neither the DOT nor the VE evidence automatically trumps the other.  SSR 00-4p.  Furthermore, evidence from VEs can include information not listed in the DOT.  *Id.*  Information about a particular job's requirements or about occupations not listed in the DOT may be

---

[2] Under the *Chenery* doctrine, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  Here, plaintiff argues that defendant violated the doctrine by making an argument based on *post hoc* rationale and requests that the Court disregard the argument.  (Doc. 22 at 2-3).  However, this Court has judged the ALJ's decision purely on those grounds expressed in the ALJ's opinion.

available in other reliable publications, information obtained directly from employers, or from a VE's experience in job placement or career counseling. *Id.* When a VE provides evidence about the requirements of a job or occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between that VE evidence and information provided in the DOT. *Id.* In these situations, the ALJ will ask the VE if the evidence he or she has provided conflicts with information provided in the DOT. *Id.* If the VE's evidence appears to conflict with the DOT, the ALJ will obtain a reasonable explanation for the apparent conflict. *Id.*

The Court finds no evidence of a conflict between the VE's testimony and the DOT. Further, even if such a conflict exists, the Court finds that the ALJ appropriately resolved it. Although plaintiff cites discrepancies in the VE testimony concerning DOT codes, the VE could have reliably obtained this information through other reliable publications or the VE's own experience. SSR 00-4p. The ALJ explicitly asked the VE whether her testimony was "in accordance with DOT," to which the VE responded, "Yes . . . and things not addressed in the DOT like absenteeism are based on job posting experience, and . . . my vocational experience." (Tr. 73).

Plaintiff relies on *Welsh v. Colvin*, 765 F.3d 926 (8th Cir. 2014), but unlike claimant Welsh, plaintiff has made no challenge to the VE's personal experience. 765 F.3d at 930. The ALJ resolved any supposed conflict by affirmatively asking about the presence of any conflict, and he was not required to pursue the topic further when the VE affirmed there was no conflict. SSR 004-p. Plaintiff's contention that the Vocational Expert Handbook requires the ALJ to inquire further about the "reasonable basis" for the VE's opinion is incorrect. (Doc. 22 at 4-5). That inquiry is only required when there is an inconsistency or conflict between the VE testimony and the DOT. SSR 004-p. As stated above, no conflict is present here. Thus, the ALJ had substantial evidence to find the VE's testimony to be consistent with the information in the DOT and was not required to further weigh the VE testimony.

## VII. CONCLUSION

For the reasons set forth above, the Court concludes the Commissioner's final decision that plaintiff was not disabled is supported by substantial evidence on the record as a whole. The decision of the Commissioner is affirmed. An appropriate Judgment Order is issued herewith.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 23, 2018.